# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERICK CLASEN, | § |
| | § |
|     *Plaintiff*, | § |
| | § |
| *versus* | §     CIVIL ACTION NO. 3:13-1390 |
| | § |
| CAROLYN W. COLVIN, | § |
| Acting Commissioner of | § |
| Social Security, | § |
| | § |
|     *Defendant*. | § |

## **REPORT AND RECOMMENDATION**

Erick Clasen ("Clasen") seeks review of an adverse decision on his application for disability insurance benefits under the Social Security Act.

### I. Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Reviewing courts also must take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights").

## II. Background

Clasen obtained a Bachelor of Science degree in electrical engineering. (T. 67). In 1991, he was diagnosed with Lyme disease and depression. (T. 189). He applied for and received social security disability benefits based on these impairments. (T. 41, 189). Clasen subsequently resumed substantial gainful activity from 2000-2009 while working as a software engineer. (T. 41, 92). Clasen claims he began "feeling sick" again in 2005. (T. 189). According to Clasen, symptoms of illness caused him to be late to work due to fatigue and, ultimately, laid off from his job on March 10, 2009. (T. 68, 94, 178, 189, 192).

On June 18, 2011, Clasen applied for disability insurance benefits, alleging that he became unable to work due to Lyme disease, chronic fatigue, depression, anxiety and back, leg, hip and foot pain as of October 15, 2010. (T. 183). His claim was assigned to an administrative law judge, Jennifer Gale Smith ("ALJ Smith"), who conducted an evidentiary hearing. (T. 63-96). Clasen attended, and testified, and was represented at the hearing by a nonattorney representative. (*Id*.). ALJ Smith received into evidence (a) testimony from Clasen, (b) forensic reports from treating sources and state agency consultants, and (c) Clasen's medical treatment records. (T. 63-96).

ALJ Smith denied Clasen's application in a written decision dated February 25, 2013. (T. 32-47). The Appeals Council denied Clasen's request for review.[1] (T. 1-6). Clasen then instituted this proceeding.

---

[1] The Appeals Council "looked at" additional medical evidence dated March 13, 2013 through May 16, 2013 from United Health Services, but decided this new information was about a later time and does not affect the decision of whether Clasen was disabled on or before February 25, 2013. (T. 2).

### III. Commissioner's Decision

ALJ Smith found that Clasen suffers from several severe impairments, including status-post Lyme disease, fibromyalgia, bilateral *pes planus*,[2] narrowing of the posterior aspect of the intervertebral space at L5-S1, hypotesterone, anxiety and depression. (T. 35). She found that Clasen's *physical* impairments reduce his work capacity such that he can now work only at the sedentary exertional level. His *mental* impairments further reduce his work capacity so that he is limited to unskilled work.[3] (T. 40). Accordingly, Clasen can no longer perform his past relevant work as software engineer. (T. 46).

Relying upon Medical-Vocational Guidelines, Section 201.28 as a framework,[4] ALJ Smith further found that, despite his impairments, Clasen can perform alternative, available work. (T. 46-47). Thus, Clasen's impairments do

---

[2] Bilateral *pes planus* is commonly referred to as two flat feet.

[3] ALJ Smith's full residual functional capacity finding was:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). The undersigned further finds that the claimant retains the ability to understand and follow simple instructions and directions; perform simple and some complex tasks with supervision and independently; maintain attention/concentration for simple and some complex tasks; and can relate to and interact with others to the extent necessary to carry out simple tasks; but he should avoid work requiring more complex interaction or joint effort to achieve work goals; and he can handle reasonable levels of simple work-related stress, in that he can make simple decisions directly related to the completion of his tasks in a stable, unchanging work environment.

(T. 40).

[4] The Medical Vocational Guidelines ("grids") are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996).

not prevent him from engaging in substantial gainful employment, and his application was denied. (T. 47).

## IV. Points of Alleged Error

Clasen argues that ALJ Smith erred as follows:

1. ALJ errs in her determination as to the functional limitations caused by fibromyalgia and errs in her assessment of the treating source opinions of both the primary doctor and the specialist, the rheumatologist Dr. Bouali;
2. ALJ erred in failing to assess all severe impairments;
3. The ALJ fails to consider Plaintiff's inability to work on a regular and continuing basis; and
4. The ALJ failed to obtain testimony from a vocational expert for consideration of the non-exertional impairments.

(Dkt. No. 19, p. 0).

## V. Step 2 Severity Determination (Point of Error 2)

ALJ Smith utilized a five-step sequential evaluation procedure prescribed by regulation for determining disability applications.[5] Existence and severity of impairments are determined at Step 2. Clasen argues that ALJ Smith erred at Step 2. This alleged error is addressed first, even though Clasen proffered it as his second point, because a palpably deficient beginning at Step 2 can compel a remand for new proceedings to further develop the record.[6]

---

[5] *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[6] *See Legare v. Commissioner of Soc.* Sec., No. 08-CV-2180 (NGG)(JMA), 2010 5390958, at *3 (E.D.N.Y. Dec. 22, 2010).

ALJ Smith declined to find Clasen's chronic fatigue and other medical abnormalities[7] as severe impairments, stating:

> The claimant, however, has failed to satisfy his burden of establishing any of his other alleged impairments as "severe" medically determinable impairments that have lasted or are expected to last a continuous period of twelve months (20 CFR 404.1509). Consequently, the undersigned finds that all of the other impairments asserted by the claimant, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic work activities, and are thus either non-severe or not medically determinable impairments.

(T. 36).

Clasen argues that ALJ Smith erred (particularly when failing to find that his fatigue constitutes a severe impairment) in two respects. (Dkt. No. 19, p. 20-22). First, Clasen asserts ALJ Smith's non-severity finding was so brief and conclusory as to prevent meaningful judicial review.[8] Second, Clasen maintains that ALJ Smith erroneously conflated the regulatory definition of "severe" with the statutory disability requirement that a severe impairment must last or be expected to last for a continuous period of not less than twelve months.[9]

While Clasen's argument has appeal, it has only pedantic value for present purposes. The Commissioner correctly responds that Clasen's fatigue and other alleged abnormalities that ALJ Smith declined to find as separate severe

---

[7] The other conditions (not relevant here) were joint pain, low back pain, positive rheumatoid factor, bilateral leg pain, bilateral hip pain, foot pain neck pain, bilateral shoulder pain, and bilateral wrist pain.

[8] Clasen cites *Legare* and *Wahl v. Astrue*, No. 10-CV-499 (LEK/VEB), 2012 WL 1676995, at *6 (N.D.N.Y. Mar. 23, 2012), *report and recommendation adopted by*, 2012 WL 1676987 (N.D.N.Y. May 14, 2012) in support of this contention. (Dkt. No. 19, p. 20). Neither case is directly on point, but each supports the general proposition that administrative decisions must be susceptible to meaningful review to survive judicial scrutiny.

[9] *See* 42 U.S.C. § 423(d).

impairments are all symptoms of and attributable to Clasen's fibromyalgia, musculoskeletal impairments and mental impairments which ALJ Smith *did* find to be severe impairments and were considered throughout the entire sequential evaluation process.[10]

ALJ Smith's decision contains specific and focused indicia that *effects* of Clasen's fatigue actually were considered and factored into the ultimate residual functional capacity rating. First, she noted that during the period at issue, Clasen sought treatment for fatigue. (T. 41). Second, she observed with respect to fibromyalgia that Clasen complained of fatigue, and assessed his residual functional capacity rating at the lowest exertional level available.

This being the case, ALJ Smith's Step 2 errors, if any, were harmless. *See Stanton v. Astrue*, 370 Fed. App'x 231, 233 n. 1 (2d Cir. 2010) (noting no reversible error by administrative law judge in finding an impairment non-severe because administrative law judge identified other severe claims at Step 2 so that claim proceeded though the entire sequential evaluation process and all impairments were considered in combination).

## VI. *Green-Younger Errors* (Points of Error 1 and 3)

These two points argue that ALJ Smith's residual functional capacity finding is erroneous because she applied incorrect principles of law when weighing relevant medical opinion and subjective evidence. To understand and

---

[10] In the "Applicable Law" section of her decision, ALJ Smith acknowledged that when determining Clasen's residual functional capacity before considering Step 4 of the sequential evaluation process, she was required to consider all of Clasen's impairments, including those that are not severe. (T. 35). She cited the applicable regulations and ruling that impose that duty. (*Id.*). At Step 3, ALJ Smith indicates that she considered all impairments, singly and in combination, when deciding whether Clasen's impairments are presumptively disabling. (T. 36). And, when determining Clasen's residual functional capacity, ALJ Smith stated that she considered all symptoms and gave careful consideration of the entire record. (T. 40).

analyze these points, it is appropriate as threshold matters to (a) describe residual functional capacity generally, (b) summarize relevant evidence at issue, (c) delineate ALJ Smith's credibility choices, and (d) identify Clasen's challenges.

## A.   *Determining Residual Functional Capacity*

At Steps 4 and 5 of sequential evaluations, administrative law judges find whether claimants can still perform their past relevant work, and, if not, whether they can perform available alternative work. Before making these determinations, they assess and articulate claimants' "residual functional capacity." This term of art refers to what claimants can still do in work settings despite physical and/or mental limitations caused by their impairments and any related symptoms, such as pain. *See* 20 C.F.R. § 404.1545. Administrative law judges thus decide whether applicants, notwithstanding their severe impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis.[11] When assessing residual functional capacity, administrative law judges must consider all of the relevant medical and other evidence, and *all* impairments, *i.e.*, both severe and nonsevere, must be factored into residual functional capacity determinations.[12]

Clinical treatment records rarely identify patients' limitations relating to specific physical and mental functions corresponding with ordinary work activities. Consequently, residual functional capacity assessments usually are based largely on forensic medical opinion and subjective evidence regarding

---

[11]   *See* SSR 96–8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed. Reg. 34474, 1996 WL 374184, at *4 (SSA July 2, 1996).

[12]   *See* 20 C.F.R. §§ 404.1520(e) and 1545; SSR 96–8P, 1996 WL 374184, at *5.

intensity, persistence and limiting effects of symptoms. Through regulations and rulings, the Commissioner prescribes special rules and protocols for weighing medical source opinion and subjective testimony.[13]

## B. *Treating Medical Source Opinion Regarding Fibromyalgia*

In January 2013, Clasen's treating rheumatologist, Dr. Henda Bouali, M.D., and nurse practitioner Kelly Miller, FNPC, provided a comprehensive assessment of Clasen's fibromyalgia by completing a "Fibromyalgia Residual Functional Capacity Questionnaire." (T. 363-67). Dr. Bouali noted morning stiffness, and non-restorative sleep. (T. 363). She assessed bilateral pain in the lumbosacral spine, cervical spine, thoracic spine, chest, shoulders, and arms. (T. 364). She noted that Clasen's pain fluctuates in frequency and severity and is aggravated by changing weather, stress, and cold. (T. 364). Dr. Bouali opined that Clasen is able to walk only one city block before needing rest, can sit for 30 minutes at a time before needing to get up, can stand for 15 minutes at a time before having to sit down or walk around, and can sit for less than two hours in a 8-hour work day. (T. 365). Dr. Bouali further stated that Clasen needs to walk around every 15 minutes and must have the option to shift positions at will from sitting, standing, or walking as well as take unscheduled breaks. (T. 366). Dr. Bouali opined that Clasen should rarely lift 10 pounds or less and never lift more than 10 pounds. (*Id*.). Finally, Dr. Bouali noted that Clasen's impairment is

---

[13] See 20 C.F.R. § 404.1527(c)(2)(treating physician rule); 20 C.F.R. § 404.1527(c)(1)-(6)(When controlling weight is not afforded, regulatory factors to determine how much weight); *see also* SSR 96-2p, TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, at *1-2 (SSA July 2, 1996) (explaining controlling-weight factors); SSR 06-03p, TITLES II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS, 2006 WL 2329939, at *4 (S.S.A. Aug. 9, 2006); 20 C.F.R. § 404.1529(c)(3)(i)-(vii) (factors to weigh subjective testimony); SSR 96-7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996).

likely to have good and bad days, and he could be expected to miss approximately three days of work per month. (T. 367).

C. *Subjective Testimony*

Clasen testified that his main problem is fatigue and pain. (T. 70, 94). He has pain in his back all the time that radiates from the back to the hips and up in to the shoulder blades. (T. 94). He has difficulty walking up stairs. (T. 75). His pain spikes when sitting, walking, or standing for a prolonged period time. (T. 95). On an average day, he can stand for about 30 minutes before his joints start to bother him. (T. 79). On a "poor day," he cannot stand for more than a few minutes. (*Id.*). As for sitting, he can sit for 30 to 45 minutes before joint pain sets in. (T. 79-80). Occasionally his back has spasms that limit his mobility where he can't move to that point of motion in the back easily. (T. 75-76, 95). Clasen claims that it is hard to exert himself for long periods of time. (T. 75). He also suffers from post-exertional fatigue–when he over exerts himself with either stress or activity, he may be "totally laid up and out of commission" for a few days. (T. 75).

D. *Credibility Choices*

Had ALJ Smith elected to give controlling weight to treating rheumatologist Dr. Bouali's opinions, she could not have found Clasen to have residual functional capacity for sedentary work.[14] Similarly, had ALJ Smith

---

[14] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a). Sedentary work generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day. *See* SSR 96-9, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK–IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 1996 WL 374185, at *3 (SSA July 2, 1996).

Dr. Bouali's opinions regarding Clasen's limitations in walking, sitting, standing and lifting are inconsistent with capacity for a full range of sedentary work.

credited Clasen's self-assessment of the intensity, persistence and limiting effects of his symptoms, a residual functional capacity for sedentary work would have been inappropriate.[15] ALJ Smith, however, did neither.

She elected, instead, to give "little weight" to treating rheumatologist Dr. Bouali's opinions (even though they were presumptively entitled to controlling weight) because Dr. Bouali's less-than-sedentary limitations were based on Clasen's subjective reports "rather than any objective findings," were unsupported in treatment notes of either Dr. Bouali or Nurse Practitioner Miller, and were "at odds with the other opinion evidence of record." (T. 44). ALJ Smith summarized her credibility assessment of Dr. Bouali's and Nurse Practitioner Miller's opinions as follows:

> Consequently, the undersigned finds Dr. Bouali's opinion to be completely subjective, unsupported by any treatment notes or reports, and *devoid of any clinical or diagnostic findings that would establish this level of disability in the claimant.*

(T. 44-45) (emphasis added).

ALJ Smith similarly discounted Clasen's subjective testimony, concluding that Clasen's statements concerning intensity, persistence and limiting effects of his symptoms were only "partially credible" because:

> There are only *minimal positive diagnostic and clinical findings to corroborate the location, duration, frequency, and intensity of the claimant's pain and other symptoms* as a result of his impairments during the period at issue. The sole imaging of record for the claimant's lumbar spine shows nothing more than narrowing at the posterior aspect of the intervertebral joint space at L5-S1.

---

[15] Clasen's testimony regarding pain spikes, spasms and fatigue when sitting, walking, or standing for sustained periods are inconsistent with demands of a full range of sedentary work. See n. 14, supra.

(T. 43) (emphasis added). ALJ Smith also considered gaps in Clasen's treatment history and the fact that Clasen received unemployment benefits after his alleged disability onset date as significant credibility factors. (*Id.*).

E.    *Clasen's Challenge*

Clasen argues that ALJ Smith applied incorrect principles of law when assessing functional limitations caused by fibromyalgia and when weighing credibility of medical opinion and subjective testimony on that issue by requiring corroborating objective proof. Clasen argues that fibromyalgia is a disease that eludes objective measurement, such that no objective tests can conclusively confirm the disease. That being the case, and because objective findings are not required in order to find an applicant disabled, Clasen contends that ALJ Smith applied an incorrect legal standard.

F.    *Discussion and Analysis*

Impairments generally are defined as "anatomical, physiological, or psychological abnormalities . . . *demonstrable by medically acceptable clinical and laboratory techniques*."[16] Applying this definition is a straightforward exercise with respect to most physical and mental impairments because they can be identified objectively through standard laboratory, imaging, physical examination and psychological diagnostic techniques. It becomes problematic,

---

[16] *See* 42 U.S.C. § 423(d)(3); 20 C.F.R. § 404.1508 (emphasis added).

however, with respect to fibromyalgia, which is a syndrome of chronic pain of musculoskeletal origin but *uncertain cause*.[17]

Persons afflicted with fibromyalgia may experience severe and unremitting musculoskeletal pain, accompanied by stiffness and fatigue due to sleep disturbances, yet have *normal* physical examinations, *e.g.*, full range of motion, no joint swelling, normal muscle strength and normal neurological reactions.[18] Thus, lack of positive, objective clinical findings does not rule out the presence of fibromyalgia, but may, instead, serve to *confirm* that diagnosis.

1. Administrative Perspective

The Commissioner recognizes fibromyalgia as a potentially disabling impairment, and describes it as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." *See* SSR 12-2p, TITLES II AND XVI: EVALUATION OF FIBROMYALGIA, 2012 WL 3104869, at *2 (SSA July 25, 2012). This ruling provides guidance on the evidence required "to establish that a person has a medically determinable impairment of fibromyalgia" and how to evaluate the limiting effects of the impairment. *See id.*, at *5. It also recognizes that diagnosis generally is reached by a process of exclusion, eliminating other

---

[17] *See Green-Younger v. Barnhart*, 335 F.3d 99, 101 n.1 (2d Cir. 2003) (citing *Stedman's Medical Dictionary* 671 (27th ed. 2000)(defining fibromyalgia as "a syndrome of chronic pain of musculoskeletal origin but uncertain cause")).

[18] See *Preston v. Secretary of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988).

medical conditions which might manifest symptoms of musculoskeletal pain, stiffness and fatigue.[19]

Once fibromyalgia has been established as a medically-determinable impairment, the Commissioner will make a residual functional assessment. In that regard, all relevant evidence is considered, but a longitudinal treatment record is of paramount importance. The Commissioner explains:

> When a person alleges fibromyalgia, *longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment.*

SSR 12-2p, 2012 WL 3104869, at *3 (emphasis added). Later in the ruling, the Commissioner repeats:

> For a person with FM, we will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have "bad days and good days."

*Id.*, at *6.

---

[19] In SSR 12-2p, the Commissioner recognizes two sets of criteria for diagnosing fibromyalgia, either of which can support a physician's opinion that the impairment was present. *See* SSR 12-2p, 2012 WL 3104869, at *2-3. Essential to both sets of criteria are (1) findings of widespread pain, "that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least three months," and (2) evidence that other disorders that could cause the symptoms and signs had been excluded. *Id.*

The first set of criteria, based upon the 1990 ACR Criteria for the Classification of Fibromyalgia, further requires the finding of "at least 11 [out of 18 designated] positive tender points on physical examination," which must be found bilaterally and both above and below the waist. *See* SSR 12-2p, 2012 WL 3104869, at *3. The second set of criteria, based upon the 2010 ACR Preliminary Diagnostic Criteria, requires "repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome." *Id.* Under this second diagnostic method, "signs" include certain "somatic symptoms." *Id.*, at *3 n. 9.

2. Judicial Discourse

As a general matter, "objective" findings are not required to find that an applicant is disabled.[20] And, particularly with respect to fibromyalgia, reviewing courts recognize that fibromyalgia can be a disabling impairment that no objective tests can conclusively confirm.[21] Consequently, it is error to deny a fibromyalgia-claimant's claim of disability on a perceived lack of objective evidence. *See Grenier v. Colvin*, No. 6:13–cv–484 (GLS), 2014 WL 3509832, at *3-4 (N.D.N.Y. July 14, 2014). It also follows that discrediting medical opinions and subjective testimony concerning limiting effects of fibromyalgia simply because such evidence is not corroborated by objective medical evidence is improper. *See Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003).

*Green-Younger* is factually indistinct from this case. There, an administrative law judge rejected both treating physician opinion and subjective evidence regarding fibromyalgia and its limiting functional effects for a perceived lack of objective corroborating evidence. The Second Circuit held that in so doing, the administrative law judge applied an erroneous legal standard. *Id.,* 355 F.3d at 109.

---

[20] *See Donato v. Sec. of Dep't of Health and Human Servs.,* 721 F.2d 414, 418–19 (2d Cir.1983) ("Subjective *pain* may serve as the basis for establishing disability, even if ... unaccompanied by positive clinical findings of other 'objective' medical evidence") (emphasis in original) (citation omitted); *Cruz v. Sullivan,* 912 F.2d 8, 12 (2d Cir.1990); *Eiden v. Secretary of Health, Educ., and Welfare,* 616 F.2d 63, 65 (2d Cir.1980); *Cutler v. Weinberger,* 516 F.2d 1282, 1286–87 (2d Cir.1975); *Cline v. Sullivan,* 939 F.2d 560, 566 (8th Cir.1991).

[21] *See Lisa v. Sec. of the Dep't of Health & Human Servs.,* 940 F.2d 40, 44-45 (2d Cir. 1991); *see also Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)*; Preston v. Secretary of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988).

Here, as in *Green-Younger*, ALJ Smith's determinations turned on a perceived lack of objective evidence. First, ALJ Smith determined that Dr. Bouali's opinion was not "well supported by medically acceptable clinical and laboratory diagnostic techniques" and was, instead, "based on claimant's own subjective report, rather than on any objective findings." (T. 44). But, as *Green-Younger* teaches, absence of medically-acceptable clinical and laboratory diagnostic findings (beyond clinical signs and symptoms necessary for a diagnosis) is a legally-improper basis for rejecting medical source opinion. It further instructs that reliance on subjective complaints in fibromyalgia cases hardly undermines medical opinion as to functional limitations it produces because patients' reports of complaints and histories are essential diagnostic tools. *Green-Younger,* 355 F.3d at 107 (citing *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997)).

ALJ Smith expressed another reason for discounting Dr. Bouali's opinion, stating that it was "at odds with the other opinion evidence of record," namely consultative examiner Dr. Magurno's medical source statement. (T. 44). In the unique context of this case, that finding does not constitute an independent and adequate basis for discrediting Dr. Bouali. Dr. Magurno conducted only one examination of Clasen (which confirmed the diagnosis of fibromyalgia), and the Second Circuit has cautioned that in fibromyalgia cases, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) (citing *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)). Here, as in *Selian*, ALJ Smith made no effort to reconcile the contradiction or grapple with Dr. Bouali's opinions regarding

Clasen's functional limitations. *See id*. "The failure to provide 'good reasons' for not crediting [treating physician's] diagnosis by itself warrants remand." *Id*. (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see* 20 C.F.R. § 404.1527(c)(2)).

Second, ALJ Smith found that Clasen's subjective allegations of pain and functional limitations were only partially credible because "[t]here are only minimal positive diagnostic and clinical findings to corroborate the location, duration, frequency, and intensity of the claimant's pain." (T. 43). She cited imaging records of Clasen's lumbar spine as showing "nothing more than narrowing at the posterior aspect of the intervertebral joint space at L5-S1." (*Id*.). As the governing circuit court stated, these reasons "simply do not undermine [a claimant's subjective] credibility" in fibromyalgia cases. *Green-Younger*, 355 F.3d at 108. Indeed, ALJ Smith's reference to Clasen's essentially negative imaging records suggests a fundamental misunderstanding of how fibromyalgia generates chronic pain without positive findings.

Substantial evidence does not support other reasons ALJ Smith gave for finding Clasen's testimony only partially credible. The notion that Clasen's credibility was impugned because he failed to seek treatment for fibromyalgia until laid off from work is merely speculative. Given that fibromyalgia is a "rule out" diagnosis, "treatment" therefor may not always be immediately forthcoming.

Finally, the fact that Clasen received unemployment compensation benefits beyond the claimed date of disability onset is not sufficient to impugn his subjective testimony in this particular case. One who claims and

receives unemployment benefits represents himself as being able to work.[22] Clasen, however, was no longer *receiving* such benefits when he *applied* for social security disability benefits. Clasen applied for social security benefits in June, 2011, and his unemployment benefits had terminated earlier that year. (T. 171).

Clasen's social security application alleged disability commencing in October, 2010 (a time when he was still receiving unemployment benefits). He provided a plausible explanation that he listed that date on his social security application because it was when he "felt poorly again at that point," and came to believe that "it was disabling." (T. 68). In absence of some affirmative evidence of intent to deceive or game the system, it was patently unreasonable for ALJ Smith to make negative inferences regarding Clasen's credibility based on this slight anomaly. Fairly construed, Clasen's testimony reflects that, after being laid off, he tried to work off-and-on depending on how he felt, but, ultimately, felt "poorly" enough where he could no longer continue to do so, and only then sought disability.

ALJ Smith thus erred in the manner in which she discounted Dr. Bouali's physical residual functional capacity assessment and Clasen's subjective testimony.

---

[22] "Courts in this circuit have considered a plaintiff's receipt of unemployment benefits for the premise that the record establishes that plaintiff was able to work before his disability onset date as evidenced by plaintiff's receipt of unemployment benefits, which requires an ability to work." *Jackson v. Astrue*, No. 1:05-CV-01061 (NPM), 2009 WL 3764221, at *8 (N.D.N.Y. Nov. 10, 2009)(internal quotations omitted)(reviewing cases and finding "although plaintiff's filing for and receipt of unemployment benefits while claiming to be disabled is not proof-positive that plaintiff was no longer disabled, the ALJ properly considered plaintiff's claim for unemployment benefits when assessing plaintiff's credibility").

*G. Harmless Error Analysis*

ALJ Smith's errors in evaluating Clasen's disability claim, and specifically in weighing treating source medical opinion and subjective evidence, were not harmless. They deprived Clasen of a substantial right to have his claim adjudicated according to correct principles of law.

Nor can a reviewing court conclude that the result would have been the same absent these errors. Had ALJ Smith not discounted Dr. Bouali's physical residual functional capacity assessment and Clasen's subjective testimony for lack of corroborating objective evidence, a finding of "disabled" might have been compelled under the evidence.

## VII. Remaining Points

Since remand is necessary based on the errors discussed above, it is unnecessary to address Clasen's remaining points relating to ALJ Smith's *mental* residual functional capacity assessment and the use of the "framework" application of the grids without aid of expert vocational testimony at Step 5. Although these points are not examined here, the Commissioner should consider them when making a new determination.

## VIII. Recommendation

The Commissioner's decision should be REVERSED, and the case should be REMANDED pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings in accordance with this recommendation.

## IX. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the   7   day of   November   2014.

*/s/ Earl S. Hines*
Earl S. Hines
United States Magistrate Judge